# Hogg's Appeal.

1. On the 7th June, 1841, the Bank of the United States made a second assignment of assets exceeding twelve millions of dollars to pay depositors, and holders of notes of the former and of the bank then existing, "being notes of the ordinary kind, payable on demand and commonly used in circulation;" and also "to sundry persons holders of notes of the said bank, commonly called *post-notes* (other than post-notes held by or issued to certain banks in the city and county of Philadelphia, for which security was provided and given by an indenture bearing date the first day of May in the present year, and which are not intended to be provided for and embraced in the present indenture)." And further providing that the bank had "resolved and agreed to provide an adequate security for the payment of the said deposits, and of the said notes, and of the said post notes" (except as aforesaid), "and of the interest to accrue upon them," &c.

It was *Held*, that the *post-notes*, meant in the said assignment, and designed to be secured by it, were such notes payable at a future day as were designed as a part of *the circulating medium;* and that the assignment did not include

notes or obligations of the bank under seal, payable at a future day in London, each being for one thousand pounds sterling, with interest, which were issued for a loan of money to the said bank, and which were not designed to be a part *of the circulation of the bank.*

2. If the terms "post-notes, as commonly called," were so new that the Courts were not presumed to understand their meaning, or to be able to learn it from books, it was proper for the auditors, before whom the question arose, to resort to the testimony of witnesses to ascertain their meaning.

3. In the proviso to the 6th section of the Act of 5th May, 1841, providing for an assignment by the Bank of the United States, it is enacted that the trustees shall receive, in payment of debts, *at par* the notes or other evidences of debt issued or created by said bank. *Held,* that by the terms *at par* was meant the amount due upon post-notes including *interest;* and that on a settlement with the trustees for the principal of the notes, the *interest* upon them might be reserved by the owner and submitted as a claim at a future time.

APPEAL from a decree of the Common Pleas, *Philadelphia,* made on 10th December, 1853, on the *third* account of John Bacon and others, assignees and trustees, under an assignment by the President, Directors, and Company of the Bank of the United States, dated 7th June, 1841.

The appellants, Sir James Hogg and others, were holders of post-notes of the Bank United States, dated the 14th day of October, 1839, and the 15th day of April, 1841, issued under a loan made by Messrs. Denison & Co., of London, amounting to £317,000 sterling.

The Bank of the United States was incorporated by Act of the legislature of Pennsylvania, of 18th February, 1836. It afterwards became embarrassed, and on the 11th May, 1837, it suspended specie payments, and, after intermediate resumptions and suspensions, it finally suspended on the 4th February, 1841.

On the 4th and 5th May, 1841, two Acts of the legislature of Pennsylvania were passed, authorizing the bank to make a general assignment of its assets for the benefit of its creditors. On the 1st May, 1841, an assignment was made to James Dundas and others of assets amounting to about $7,772,250.33, to secure the payment to the city banks of $5,078,444.94. On the 7th June, 1841, *a second* assignment was made of assets, amounting to $12,475,300.60, to John Bacon and others. The material question involved in this appeal arose under the terms of this assignment. In the preamble to the assignment, it was stated as follows:—

" Whereas the said party of the first part are indebted to sundry persons, depositors in the said bank and the branches or offices thereof; and also to sundry persons, holders of notes of the late Bank of the United States, incorporated by Congress; and to sundry persons, holders of notes of the present bank, being notes of the ordinary kind, payable on demand, and commonly used in circulation; and also to sundry persons holders of notes of the said bank commonly called post-notes (other than post-notes held

by, or issued to, certain banks in the city and county of Philadelphia, for which security was provided and given by an indenture, bearing date the first day of May, in the present year, and which are not intended to be provided for and embraced in the present indenture): And whereas the said party of the first part has resolved and agreed to provide an adequate security for the payment of the said deposits, and of the said notes, and of the said postnotes (save and except the said post-notes heretofore provided for as above said), and of the interest to accrue upon them," &c.

The assignment was made to pay the deposits, notes, and post-notes, according to the said preamble.

By a statement called the "State of the Bank," dated the 7th of June, 1841, it appeared that the post-notes of the bank outstanding at that time amounted to $485,368.34. Post-notes, payable to John Ross or bearer, on account of the Cherokee Tribe, being what was commonly called the *Ross Issue*, constituted a part of the post-notes of the bank, and have been recognised as such by the different trustees and auditors and in the final adjudication of all the Courts in the accounts already filed.

On the 4th and 6th of September, 1841, the bank made a 3d assignment of assets, amounting to $15,929,038.15, to the said James Robertson and others, in trust for their creditors without preference. This assignment included all the remaining assets, excepting stocks amounting to $15,581,000.13, hypothecated in Europe for more than their value; and sundry shares in Pennsylvania improvement companies, set forth in the schedule annexed to the said assignment, which were subsequently, under legal process, sold for the sum of $1185.

On the 22d March, 1852, the bank executed to Molton C. Rogers and others, a general assignment in pursuance of the directions of the Acts of the 4th and 5th May, 1841. The trustees therein named, by way of distinction, have been called statutable trustees.

On the 23d day of August, 1839, the bank executed to Samuel Jaudon, a power of attorney to borrow money in Great Britain or on the Continent of Europe or elsewhere. And for that purpose, to execute all papers and documents, and deliver all securities or evidences of debt, which the said attorney might think fit.

In pursuance of this authority Jaudon contracted various loans in Europe.

1. On the 26th day of December, 1839, at Paris, he borrowed of DeRothschild Frères £st'g 900,000. To secure this loan in pursuance of the written agreement between the parties, the bank deposited certain securities, and issued certain instruments called in French " obligation," translated into English, " debenture."

2. On the 14th day of January and 4th day of July, 1840, at Amsterdam, Jaudon borrowed of Messrs. Hope & Co. two sums of 5,500,000 and 4,500,000, in all 10,000,000 guilders, equal at 42 cents per guilder to $4,200,000; to secure the payment of this loan, Jaudon entered into two written agreements with Messrs. Hope & Co., and deposited certain stocks therein enumerated.

These agreements were executed according to the laws of Holland, and remain deposited with the notary public at Amsterdam as thereby required.

3. On the 1st day of April, 1837, the bank·borrowed of Messrs. F. Huth & Co., of London, £ st'g 200,000, and to secure the payment issued bonds under the seal of the said bank, with coupons called "warrants," annexed, payable in the city of London.

4. On the 12th day of October, 1839, the bank, by Jaudon, and Denison & Co., of London, entered into an· agreement by which the ·bank deposited stocks amounting to $4,450,000, to secure the payment of the notes of the said bank, amounting to £ st'g 800,000, with interest, dated at London, the 14th of October, 1839; one-half payable at London, on the 15th day of April, 1841, and the other half on the 15th day of April, 1842.

Six hundred and fifty notes, to wit, £ st'g 800,000, were accordingly issued in the city of London, and circulated in that city under the denomination of post-notes or post-bills, in contradistinction to those issued under the Rothschilds loan, which ˙were called debentures.

On the part of the appellants it was stated that these notes were also called *post-notes and post-bills* in the gazettes and price currents and the newspapers of the United States, at and about the time they were issued, and prior to the 7th of June, 1841. These were in the following form:—

Bank of United States.
Loan of £800,000.

£1000.

· The President, Directors, and Company of the Bank of the United States, promise to pay the bearer, on the 15th day of April, 1842, at the banking-house of Messrs. Denison & Co., in London, one thousand pounds sterling; with interest thereon from the 15th day of October, 1839, at the rate of six per centum per annum, payable semi-annually, on the delivery of the annexed coupons.

This note forms a part of a loan, &c.

For the President, Directors, and Company of the Bank of the United States.

Signed        S. JAUDON, Attorney.

London, this 15th day of October, 1839.

[Hogg's Appeal.]

On the 15th April, 1841, when the first class of notes, amounting to £ st'g 400,000, were about to become due, Jaudon and Denison & Co. entered into a new agreement. The bank deposited the additional security of $225,000 of Pennsylvania 5 per cent. stocks; the notes when becoming due were cancelled, and new notes at time were issued payable on the 15th day of April, 1842. Coupons for the payment of the interest, payable before maturity, were attached to all the notes.

On the 26th day of April, 1853, John Bacon and Thomas Robins filed their third account, containing the sum of $324,747.07, to be distributed amongst the creditors. This account was referred to auditors to report distribution.

On the part of the appellants, were presented to the auditors, post-notes issued under the Denison loan, amounting to £ st's 317,000, with a statement of the amounts received from the collateral stocks pledged, principal and interest, leaving a balance due of $631,400.05, with interest thereon from the time that Denison & Co., by virtue of the authority vested in them, had sold the collaterals hypothecated as before stated.

The Marine Insurance Company of Philadelphia presented a claim of $9557.16, and John Pickens presented a claim of $1890.76. These claims were both *for interest* on notes and post-notes of the bank sold by them, and by the purchasers paid to the bank in satisfaction of debts due to the bank at the time of the assignment under the provisions of sections 20 and 6 of the Acts of 4th and 5th May, 1841.

Washington Jackson also presented a claim for the sum of $43,555.23, with interest from the 29th of June, 1838, alleged to be due to him as the plaintiff in a writ of foreign attachment against Warwick and Claggett, in which the bank were made garnishees.

James Robertson and others, trustees under the assignment of the 4th and 6th of September, 1841, claimed the balance of the fund after paying the dividends to certain undisputed creditors enumerated in schedules attached to the said report.

In the report of the auditors it was stated that notes, such as those issued under the Denison loan, were not "commonly called post-notes in Philadelphia and in the United States, at the date of the assignment." They rejected the claim of the holders of such notes; also the claim of Washington Jackson; and reported that after the dividends of undisputed creditors were deducted, the following be paid, viz.: 1. The sum of $9557.16 to the Marine Insurance Company of Philadelphia; 2. The sum of $1890.76 to John Pickens; 3. The balance of $249,285.72 to James Robertson and others, trustees as aforesaid.

Exceptions to the report were filed on the part of the holders of

[Hogg's Appeal.]

the notes under the Denison loan, and on the part of Washington Jackson; but, on the 10th December, 1853, the Court overruled the exceptions and confirmed the report.

By an agreement of parties, and by order of Court, a large sum was paid over to the trustees under the assignment; leaving $71,447.92 subject to decision upon the appeals.

An appeal was entered for holders of the Denison notes, *for whom the whole fund was claimed;* and another appeal was entered for Washington Jackson.

In the case of Hogg's Appeal exceptions were filed, 1. To the decree in favor of the Marine Insurance Company. 2. To the decree in favor of Pickens. 3. To the decree of $60,000 to Robertson and others, as trustees. 4. To the decision that the notes issued under the Denison loan were not entitled to a dividend.

In the proviso to the 6th section of the Act of 5th May, 1841, it is enacted, That the said trustees (under the assignment authorized to be made by the Bank of the United States), shall receive in payment of debts due to the said bank or to them, *at par*, the notes or other evidence of debt issued or created by said bank.

*Bayard* and *Randall*, for holders under the Denison loan.— Post-notes are notes payable after date: 3 *Com. Rep.* 19; 2 *Ser. & R.* 463, Dyott's Estate; 2 *Bouvier's Dic.* 340; 2 *W. & Ser.* 443; 3 *Kent* 74. Also, opinion in Bank United States *v.* Peabody, 8 *Harris* 457, in reference to the notes to Denison & Co. It was said that the exclusion of the post-notes in the assignment was an argument in favor of these notes being included in it: *Dwarris on Statutes* 22–659; 2 *And.* 192; 19 *Vin.* 531.

As to the term, "commonly called post-notes," used in the assignment, it was said that attention should not be confined to the understanding had of them in Philadelphia prior to 7th June, 1841, to which the evidence heard by the auditors had been limited; nor even to their meaning in *Pennsylvania*, though one of the witnesses stated that the common acceptation of post-notes in Philadelphia, was that of "notes issued by a bank payable after date." It was said that the notes known as "The Ross Issue," were payable to John Ross or bearer, and were sent to John Ross in the Cherokee country, and never circulated in Philadelphia, yet they have been termed and recognised under the trusts as *post-notes:* 6 *Wharton* 586. They have been recognised as such under the second and third trusts. The Bank of the United States had an agency in London; and May Humphreys, a witness, says that the instruments issued under the Denison loans were called "post-notes

and post-bills." That they were so called in the newspapers *in England*.

Further; the Denison notes are not to be excluded because held by foreigners. Foreign depositors are secured by the assignment as well as depositors residing in the United States.

In Bicknell's Reporter of 5th November, 1839, this issue was called "post-notes."

*C. Ingersoll* was on the part of the Marine Insurance Company. —The appellees held post-notes of the Bank United States, the principal of which they sold to persons who bought them to apply them to the payment of debts due to the bank.

It was further stated that when the notes, under which the claim was made for the Marine Insurance Company were withdrawn from the trustees' possession, the person who acted for the persons interested in them signed a receipt for them, in the receipt book of the trustees, by the terms of which, the notes being about to be used in the extinguishment of debts, the claim upon the notes to the first dividend of the trust, and to a dividend under the September trusts, was released; but at the foot of the receipt was a notification made at the instance of the agent that he retained the claim *for interest*.

*G. M. Wharton* and *Porter*, for the trustees.

The opinion of the Court was delivered by

LOWRIE, J.—This is one of a class of claims called the Denison loan to the Bank of the United States, and the principal question here is, whether they are entitled to share in the funds assigned by the bank to John Bacon and others, on the 7th June, 1841, for the benefit of a portion of its creditors. The beneficiaries under this assignment are described as depositors, holders of notes of the ordinary kind payable on demand, and holders of notes commonly called post-notes. The appellants claim to be holders of post-notes within the meaning of this provision.

It is very important to notice that this assignment is a unilateral declaration of will or purpose, just as much so as a statute or last will; and for this reason our aim in interpreting it, must be to ascertain the intention of the assignors alone. The rule therefore, that a deed is to be interpreted most strongly against the grantor, cannot aid us, for this applies only to contracts. Besides, when this rule was transferred from the Roman law to ours (*Dig.* 50, 17, 172,) the reason of it was left behind, and this has seriously affected its value. That reason interpreted obscurities and ambiguities against the party who defined or wrote down the terms, because the fault was his: *Dig.* 2 14, 39; *Dig.* 18, 1, 21 and 33; *Dig.*

2 s 2

45, 1, 99, pr.; *Dig.* 45, 1, 38, 18. *In stipulationibus, verba contra stipulatorem interpretanda sunt.* (In the Roman law the *stipulator* proposed the terms, and they were simply accepted by the *promisor.*) This assignment, being unilateral, does not come within the rule or its reason, and if there be any obscurity here, it has in no way affected the previous position or rights of these claimants. It is a law imposed upon property by those who had the sole power to direct .its disposition, and we must read it as the expression of their intention. It is therefore necessary to inquire into the circumstances of the bank and its relations to the different classes of its creditors at the time the assignment was made.

Its embarrassments began to be seriously felt in the fall of 1836, as we discover from the fact that then it began to issue post-notes, and it continued to do so until June, 1840; and when this assignment was made there were of them outstanding over $485,000. The greater part of these were under seal and bearing interest, and they were all called post-notes at the bank and in the community.

In April, 1837, the bank borrowed of Huth & Co., London, say $960,000, and gave their. bonds with interest coupons or warrants. These bonds differ from the Dennison issue only by the presence of the seal and the absence of security, and yet it seems that, in the English stock market, they were quoted as post-notes.

On the 11th May, 1837, the bank suspended payments, and when, in 1839, they were endeavoring to resume, they borrowed large sums in Europe. On the 12th October, 1839, they borrowed, through Denison & Co., say $3,840,000, and gave securities estimated at $4,675,000; and on the 26th. December, 1839, they borrowed from Rothschilds, say $4,320,000 (I count the pound sterling at $4.80), and gave securities estimated at $5,000,906. For the Denison issue they gave obligations called "notes" with coupons for interest, and containing the pledge of the securities. The principal contracts are essentially promissory notes. The assurances given to the Rothschilds were of precisely the same character, but they were expressed in French and called "obligations," and translated into English "debentures." We see no direct evidence that these were called post-notes even abroad.

The bank's difficulties continuing, they borrowed, in January and July, 1840, from Hope & Co., of Amsterdam, $4,200,000, giving obligations and securities. At another attempt to resume, in January, 1841, they made an arrangement to meet the balances due to the Philadelphia banks, in pursuance of which post-notes were issued to those banks amounting to $5,000,000. The resumption thus brought about was not permanent, and the final suspension took place 4th February, 1841; and on 1st May, the bank

assigned a portion of its effects to secure the post-notes which had thus been issued to the other banks.

If now we regard the Denison issue as post-notes within the meaning of the assignment, there is no apparent reason for excluding those of Huth & Co., and Rothschilds; and yet no claim is presented on their account.

We are at no loss for the reason or motive that led to this assignment, for it is clearly expressed—because the bank had "resolved and agreed to provide an adequate security" for the creditors described. Now it is not at all plain, that this purpose is effected if the European loans to the amount of $9,000,000 are to come in for a share. Besides this, it is rather improbable that they, who had already received securities to an amount which, less than two months before, and perhaps even then, were deemed adequate, should be connected in the same provision with those who had no security, and this too without any provisions being made for the difference of relation in which they stood, or at all noticing that difference.

The exception of the banks from the benefit of the assignment, because they had securities already, is some evidence that it was not intended to include the Denison issue. Their claims would not be due for nearly a year and it is not at all probable that the bank were thinking of those who had no present power to annoy or urge them. But the deposits, ordinary circulation, and admitted post-notes, were all due and might be pressed immediately, except a few post-notes having a few days to run. Certainly all these facts leave a very strong impression that the bank was not thinking of the Denison claims, did not distinguish them from those of Huth & Co., and of Rothschilds, and did not regard them as post-notes.

The appellants' position is thought to be strengthened by the fact of the exception of the post-notes held by the Philadelphia banks, on the maxim, *exceptio unius est inclusio alterius*. But there was security already for these claims as well as for those of the banks, and therefore the appellants fall within the reason of the exception and not of the provision. Without this; if the appellants do not belong to the classes positively included, they cannot be placed there by an exception of some of those who do belong to them.

Are the obligations, constituting the Denison issue, properly called post-notes? Similar obligations of the North American Trust and Banking Co., seem to have been so called: 3 *Denio* 70; 3 *Barbour* 226; 3 *Comstock* 21; but this may be a misapplication of the name. The word indicates a note payable at a future day; but this will not answer for a definition, for it is not usual so to designate the notes of individuals. The best way of defining them

is to ascertain their history, and this is very well illustrated in the evidence.

They are a species of obligation resorted to by banks when the enchanges of the country, and especially of the banks, have become embarrassed by excessive speculations. Much concern is then felt for the country, and through the newspapers it is urged that post-notes be issued by the banks "for aiding domestic and foreign exchanges," as a "mode of relief," or a "remedy for the distress," and "to take the place of the southern and foreign exchanges." And so presently it is done.

Post-notes are therefore intended to enter into the circulation of the country as part of its medium of exchanges; the smaller ones for ordinary business, and the larger ones for heavier operations. They are intended to supply the place of demand notes, which the banks cannot afford to issue or re-issue, to relieve the necessities of commerce or of the banks, or to avoid a compulsory suspension. They are under seal, or without seal, and at long or short dates, at more or less interest or without interest, as the necessities of the bank may require. Like the Housatonic Railroad Company's notes, or those of the Manual Labor Bank, they may even be marked on the face "secured by pledge of stock and property," or "secured in trust on real estate," or, like those of the New York banks, the notes may be in fact so secured; still, as they are intended and issued not merely as evidence of a loan, and to be thrown into the stock market, but as a part of the circulating medium, they are called post-notes. The obligations called the Denison issue are not of this character, and cannot properly be called post-notes.

But the bank has not left its intention open to the interpretation of a general description, for it limits its provision to those obligations "commonly called post-notes." It distinguishes between ordinary notes and post-notes, but does not stop there, lest the word post-notes should be taken as a description and not as a name. It is not all notes payable on time that are provided for, but those commonly called post-notes. This excludes the genus if the species above be thus commonly named. Now if the article or its name be so new that the judges are not presumed to know it definitely by its name, or to be able to learn it, as they do their law, from their books, then its definition becomes a matter of fact to be decided on the testimony of witnesses. It was so tried by the auditors, and we are satisfied that they arrived at the proper conclusion.

The objections to the decree, so far as it relates to the claims of Pickens, and of the Marine Insurance Company, are also unfounded. The Act of Assembly requiring the notes of the bank to be taken at par, did not intend to alter the contract. Par

means the amount really due including interest. And the claimants have a right to sell their claim to the principal of the notes and retain their claim for interest, and this is what was done.

.Appeal dismissed at appellants' cost.

BLACK, C. J., dissented.